```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT

LAWRENCE B. TIRRENO, ET AL.,      :
                                  :
     Plaintiffs,                  :
                                  :
V.                                :   CASE NO. 3:03-CV-1322(RNC)
                                  :
BARBARA MOTT d/b/a BARBARA'S      :
BAIL BONDS, ET AL.,               :
                                  :
     Defendants.                  :
```

RULING AND ORDER

This action arises from an allegedly unconstitutional search of the plaintiffs' residence by bail enforcement agents ("BEAs") and subsequent activities relating to an attempt to apprehend a fugitive.  The plaintiffs allege that they consented to the search of their residence only after two Westport police officers told them they had no choice.  Suit is brought under 42 U.S.C. § 1983 and state law against the three BEAs, including Dennis A. Phang; the surety bail bond agent who hired the BEAs, Barbara Mott d/b/a Barbara's Bail Bonds; the surety, Seneca Insurance Company, Inc.; the two Westport police officers; the Westport Police Department and the Town of Westport.  The case is now before the court on motions for summary judgment filed by Seneca, Mott and Phang (Docs. 106, 108, 110 & 119).  I conclude that Seneca is entitled to summary judgment but Mott and Phang are not.

Background

The pleadings, depositions, affidavits and other exhibits on file, viewed most favorably to the plaintiffs, show the following.  Seneca contracted with Mott to issue surety bail bonds in Seneca's name (the "agreement").[1]  Under the agreement, Seneca furnished Mott with powers of attorney to write bail bonds.  Pls.' Mem. Opp'n Seneca Mot. For Summ. J., Attachment 3, Ex. 2 to Burns Dep. at 1-2.  The agreement required Mott to "comply with any and all directions . . . from time to time given" by Seneca, id. at 3, but made Mott "solely responsible for location, apprehension, . . . and/or surrender of bond principals."  Id. at 1.  The agreement also specifically stated that if Mott elected to locate and apprehend a principal, who had failed to appear as required, she would do so "at [her] own initiative, under [her] own direction, and at [her] own risk."  Id.

In 2001, Mott posted seven bail bonds for James Freeman.  Pls.' Local Rule 56(a)(2) Statement ("PSOF") ¶ 6; Mott's Local Rule 56(a)(1) Statement ("DSOF") ¶ 6.  Seneca was the surety on three of the bonds.  In January 2002, Freeman "skipped" on the bonds by failing to appear in court.  PSOF ¶ 7; DSOF ¶ 7.  Mott

---

[1] The record contains a written agreement dated December 1, 2001.  See Pls.' Mem. Opp'n Seneca Mot. For Summ. J., Attachment 3, Exs. 2- 3 to Burns Dep.  It is undisputed that the terms set forth in this document governed the relationship between Seneca and Mott at the relevant time.

hired three licensed BEA's to help apprehend Freeman, defendants Phang, Poole and Folston.  PSOF ¶ 8; DSOF ¶ 8.  Mott was not required to notify Seneca that she was searching for Freeman, and Seneca was unaware of Mott's attempt to apprehend him.

Mott learned that Freeman was dating Paulina Tirreno and that "they were spending 'every minute' together."  DSOF ¶ 11; PSOF ¶ 11; Mott Aff. ¶ 9.  On March 31, 2002, at about 11:00 p.m., Mott, Phang and Poole went to the Tirreno residence, where Paulina was living with her parents, Lawrence and Mary, and her siblings, Carolyn and Jakub.  PSOF ¶ 10; DSOF ¶ 10; Mary Tirreno Depo. at 168.  They demanded that the Tirrenos let them in to look for Freeman but were refused entry.  Mary Tirreno Depo. at 108, 161-62.  The Tirrenos then called the Westport Police Department while Mott and the BEAs waited outside.  PSOF ¶ 13; DSOF ¶ 13.

Westport police officers Donald Rice and Walter Broadhurst responded to the scene and told the Tirrenos that Mott, Poole and Phang had "special rights" to enter the house to look for Freeman.  Lawrence Tirreno Depo. at 54-55; Mary Tirreno Depo. at 184-85.  The Tirrenos responded that they had a vicious dog in the house.  The officers replied that they could call animal control personnel who would "do whatever it takes to take care of [the] dog", Mary Tirreno Depo. at 187, including using means "to put the dog down."  Lawrence Tirreno Depo. at 56.  The Tirrenos

3

then allowed the officers, Mott, Poole and Phang to enter the house because they believed, based on the officers' statements, that "it was the only thing [they] could do." Lawrence Tirreno Depo. at 57; See Mary Tirreo Depo. at 193-94 (denying that she gave permission for anyone to enter her home).

The BEAs proceeded to search the home accompanied by the officers. John Poole Depo. at 122; Dennis Phang Depo. at 76; but see Paulina Tirreno Depo. at 134 (stating that the officers did not take part in the search, but waited in the foyer of the house until the search was over). Mott remained in the foyer. Jakub Tirreno Depo. at 112. When the search failed to turn up Freeman, Mott lunged at Paulina and said "I am going to follow you day and night until I find him." Paulina Tirreno Depo. at 153.

Mott subsequently followed Paulina and parked outside the Tirreno's house. Paulina Tirreno Depo. at 160. She also visited a store where Paulina worked and told a manager that Paulina was dating a drug dealer. Paulina Tirreno Depo. at 201-203. Folston called Paulina to ask if she knew where Freeman was, Paulina Tirreno Depo. at 167, and went to the store where she worked and asked her about Freeman. Paulina Tirreno Depo. at 176-180. In addition, Mott went to Lawrence Tirreno's workplace and told his brother that Paulina was "helping out a fugitive." Jakub Tirreno Depo. at 90. Freeman was later apprehended outside Connecticut.

Discussion

Summary judgment may be granted if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must review the record as a whole, credit all evidence favoring the nonmovant, give the nonmovant the benefit of all reasonable inferences, and disregard all evidence favorable to the movant that a jury would not have to believe. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51 (2000).

I.  Seneca's Motion

Plaintiffs claim that under principles of agency law, Seneca can be held liable for acts and omissions committed by Mott and the BEAs in connection with the attempt to apprehend Freeman. Seneca contends that it is entitled to summary judgment because Mott was never given greater duties or obligations by Seneca than allowed by Conn. Gen. Stat. § 38a-660, which defines a "surety bail bond agent" as a person appointed by an insurer by power of attorney to execute or countersign bail bonds for the insurer. I agree.[2]

To prove an agency relationship, plaintiffs must show "(1) a manifestation by the principal that the agent will act for him;

---

[2] Because I find that Mott was not Seneca's agent for the purpose of apprehending Freeman, I do not consider whether Mott was authorized to employ the BEA's as Seneca's subagents. See Leary v. Johnson, 159 Conn. 101, 105 (1970).

5

(2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking." Beckenstein v. Potter & Carrier, Inc., 191 Conn. 120, 133 (1983) (internal citations omitted); see also Housatonic Valley Publ'g Co. v. Citytrust, 4 Conn. App. 12, 16 (Conn. App. Ct. 1985) (noting that the burden of proving agency is "on the party asserting its existence").  In assessing whether an agency exists, courts consider, among other things, "whether the alleged principal has the right to direct and control the work of the agent," and "whether the principal or the agent supplies the 'instrumentalities, tools and the place of work'."  Beckenstein, 191 Conn. at 133.

One may be an agent for some business purposes and not others.  Wesley v. Schaller Subaru, Inc., 277 Conn. 526, 541-42, 546 (2006).  Whether an agency relationship exists is normally a question of fact, but it becomes a question of law when no reasonable juror could find agency under the circumstances. Hallas v. Boehmke & Dobosz, Inc., 239 Conn. 658, 674 (1997).

Seneca does not dispute that Mott was its agent for soliciting, executing and countersigning bail bonds.  Def.'s Reply Mem. Supp. Mot. Summ. J. at 7.  Plaintiffs argue that Mott was also its agent for apprehending fugitives who "skipped." I disagree.

6

Contractual Agency

Plaintiffs' contention that the agreement expressly creates an agency relationship for fugitive recovery contravenes established principles of contract interpretation.  Plaintiffs argue that Mott was Seneca's agent for all purposes because the agreement required Mott to comply with any directions that Seneca gave her.  However, the agreement also contains a provision which says that, if Mott chooses to search for a fugitive, she does so solely at her own direction and on her own initiative.

An agreement "must be interpreted as a whole, with all relevant provisions construed together."  Beckenstein, 191 Conn. at 134.  Furthermore, when a contract contains specific and general references to the same subject matter, the specific references prevail over the general.  Zhang v. Omnipoint Commc'ns Enters., Inc., 272 Conn. 627, 639 (2005).  To interpret the general provision to give Seneca the right to control Mott's recovery actions would render superfluous the more specific section disallowing such control.

Furthermore, because the agreement allows Mott to decide both whether to apprehend a fugitive and how to do so, plaintiff's contention contradicts "an essential ingredient of agency, which is that in order to find an agency relationship, the agent must be working at the behest and for the benefit of the principal."  Beckenstein, 191 Conn. at 138 (internal

7

quotation omitted).  It is undisputed that Seneca did not know Mott was searching for Freeman and was unaware of how she was conducting the search.

Plaintiffs also argue that the powers of attorney Mott executed on Seneca's behalf "created an express, unrestricted agency."  Pls.' Mem. Opp'n Seneca Mot. For Summ J. at 16.  However, their text does not support that interpretation.  These powers of attorney gave Mott the authority to issue a bond in Seneca's name and "ratifie[d] and confirm[ed]" all that Mott could "lawfully do and perform in the premises by virtue of these presents."  Pls.' Mem. Opp'n Seneca Mot. For Summ. J., Attachment 3, Ex. 3 to Burns Dep.

Plaintiff's express agency claim is clearly unavailing.  Powers of attorney must be strictly construed and a court may not imply authority that the power of attorney does not express.  See 3 Am. Jur. 2d Agency § 28 (2006); United States v. Campola, 554 F. Supp. 20, 23 (N.D.N.Y. 1982). Seneca's powers of attorney make no mention of fugitive recovery.  They limit Mott's authority to the situation "in the premises"; that is, promising to pay the bond amount if the person released on bond does not appear.  They do not contradict the agreement between Seneca and Mott that Mott would act on Seneca's behalf only for the purpose of issuing bonds and do not create an unrestricted agency relationship.

8

Statutory Agency

Plaintiffs contend that, even if the agreement does not create an agency relationship, Connecticut statutes make Mott Seneca's agent for fugitive recovery. An agency relationship may be created by statute, rather than contract. State of Connecticut v. Smith, 40 Conn. App. 789, 798 (Conn. App. Ct. 1996). If the statutory scheme establishes all three elements of agency, "an agency relationship exists by operation of law." Id. at 799.

The various statutory provisions that plaintiffs cite do not create an agency relationship between Seneca and Mott for the purpose of fugitive recovery. Conn. Gen. Stat. § 38a-660 defines a surety bail bond agent as one who has been "appointed by an insurer by power of attorney to execute or countersign bail bonds for the insurer in connection with judicial proceedings." Conn. Gen. Stat. § 38a-660(a)(3) (2006). No other statutes indicate that an agent acts for the insurer when she searches for a fugitive. Therefore, plaintiffs cannot establish that, as a matter of statute, Mott was Seneca's agent when she searched for Freeman.[3]

---

[3]Plaintiffs also argue that Mott is Seneca's common law agent because the common law right to seize a fugitive is vested in Seneca and Mott could not have exercised that right unless Seneca delegated it to her. Courts have held that a surety has the right to apprehend a fugitive. See Taylor v. Taintor, 83 U.S. 366, 371 (1873) (stating that sureties may seize fugitives); State v. Nugent, 199 Conn. 537, 549 (1986); but see United States

9

Nondelegable Duties

Finally, plaintiffs allege that Seneca owed them a nondelegable duty to ensure that Mott and the BEA's did not violate their rights because Seneca could reasonably foresee harm to them "by its agents in the absence of training, instructions, supervision, and precautions aimed at sensitizing these agents to the limits of their authorities, proper fugitive location and recovery techniques, and the rights of third parties."  Pl.'s Mem. Opp'n Seneca Mot. Summ. J. at 19.  One may be liable for the actions of an independent contractor when the work to be performed by the contractor is inherently dangerous.  See Gazo v. City of Stamford, 255 Conn. 245, 255 (2001); Mozeleski v. Thomas, 76 Conn. App. 287, 292 (Conn. App. Ct. 2003).  As discussed above, the work Mott was to perform on Seneca's behalf included only the solicitation and execution of bail bonds.  Because plaintiffs do not allege that those activities were inherently dangerous or were negligently performed, they cannot prove that

---

v. Hollender, No. 01-1350, 2001 U.S. App. Lexis 20133, at *4 n. 2 (2d Cir. Aug. 16, 2001) (unpublished) (interpreting Taylor v. Taintor to describe "the traditional role of a bondsman"); Lopez v. McCotter, 875 F.2d 273, 277 (10th Cir. 1989)(noting that bondsmen also have a common law right to recapture fugitives); Jaffe v. Boyles, 616 F. Supp. 1371, 1375 (W.D.N.Y. 1985) (same). A bondsman may seize a fugitive on a surety's behalf if the surety authorizes her to do so.  Nugent, 199 Conn. at 549. However, plaintiffs have offered no evidence that Seneca authorized Mott to apprehend Freeman on its behalf, and therefore they cannot hold Seneca liable under the common law.

Seneca breached a nondelegable duty.[4]

For all the forgoing reasons, plaintiffs' claims against Seneca present no material issue of fact requiring a trial and Seneca is entitled to judgment as a matter of law.

II. <u>Other Defendants' Motions</u>

<u>§ 1983 Claim</u>

In count four of their third amended complaint, plaintiffs allege that Mott and Phang deprived them of their Fourth Amendment right to be free from an unreasonable search. To be liable under § 1983, Mott and Phang must have been acting under color of state law when the deprivation occurred. 42 U.S.C. § 1983 (2000). A private party acts under color of state law when "the deprivation [is] caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State . . . [and] the party charged with the deprivation [is] a person who may fairly be said to be a state actor . . . because he has acted together with or has obtained significant aid from

---

[4]Additionally, plaintiffs seek to hold Seneca liable under Conn. Gen. Stat. § 52-571e, which allows any person injured "by the actions of an agent of a surety on a bond in a criminal proceeding in taking or attempting to take into custody the principal on the bond" to sue the agent. Conn. Gen. Stat. § 52-571e (2006). Plaintiffs argue that the statute implicitly authorizes a cause of action against the surety as well. Because I hold that Mott was not Seneca's agent "in taking or attempting to take" Freeman into custody, I find that plaintiffs have failed to state a cause of action under Conn. Gen. Stat. § 52-571e and decline to determine whether the statute may be extended to insurers.

state officials . . . ." Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982).

On the night Mott and Phang entered plaintiff's home, they claimed to be exercising a bondsmen's common law right to seize his principal. See Taylor v. Taintor, 83 U.S. 366, 371 (1873); State v. Nugent, 199 Conn. 537, 543 (1986)("The common law confers on the surety on a bail bond the right to apprehend and deliver his principal in discharge of his bail at any time"). Mott continues to assert that common law right in her motion for summary judgment. Def. Barbara Mott's Mot. For Summ. J. at 7. Therefore, when Mott and Phang entered plaintiffs' home, they acted pursuant to a common law privilege granted by Connecticut law, and the first element of the Lugar test is satisfied. See Bailey v. Kenney, 791 F. Supp. 1511, 1521-22 (D. Kan. 1992) (citing Taylor v. Taintor and holding that "[w]hen [the bail bondsmen] made his forced entry into plaintiff's home and detained plaintiff, he acted pursuant to a statutory and common law privilege granted by Kansas law").

Mott and Phang may also be considered state actors because they acted together with, and obtained significant aid from, the Westport Police Department. The police officers told the Tirrenos that Mott and Phang had a right to enter and search their home; Lawrence Tirreno testified that he would not have allowed Mott and Phang to enter the house if the police officers

12

had not been there.  Crediting plaintiffs' allegations, the officers coerced them into permitting the entry by threatening to kill their dog, and the officers may have physically aided Phang in looking for Freeman.  This is sufficient to satisfy the second prong of the Lugar test.  See Landry v. A-Able Bonding, Inc., 75 F.3d 200, 204 (5th Cir. 1996) ("The majority of federal courts that have addressed the state action issue in the context of bail bondsmen have based their decisions on whether the bondsmen enlisted the assistance of law enforcement officers in arresting their principals"); Jackson v. Pantazes, 810 F.2d 426, 429 (4th Cir. 1987) (holding that the second element of Lugar was satisfied because a state police officer had assisted the bail bondsmen in gaining entrance to the home and had restrained the home's occupant during the search); Bailey, 791 F. Supp. at 1522 (same).  Therefore, Mott and Phang may be liable under § 1983.

Mott and Phang argue that, even if they were state actors, the search was constitutionally permissible because the Tirrenos consented to it.  See Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973) ("a search conducted pursuant to a valid consent is constitutionally permissible").  Consent to a search is valid if it is "freely and voluntarily given," id., that is, not "coerced by threats or force, or granted only in submission to a claim of lawful authority."  Id. at 233.  Plaintiffs counter that Mr. and Mrs. Tirreno did not voluntarily consent to the search of their

home, but acquiesced after the police told them they had no alternative. Because the voluntariness of the consent is a disputed issue of material fact, see id. at 248-49 ("Voluntariness is a question of fact to be determined from all the circumstances"), defendants are not entitled to summary judgment on plaintiff's § 1983 claim.

### Negligence Claim

Plaintiffs claim that Mott and Phang acted negligently in searching their home. Mott and Phang respond that "[h]aving consented to [their] entry, the Tirrenos cannot now seek to classify it as tortious." Def. Barbara Mott's Mot. For Summ. J. at 8. Because the issue of consent is disputed, this claim survives summary judgment.

### Emotional Distress Claim

Mott and Phang argue that they are entitled to summary judgment on the claim for intentional infliction of emotional distress because no jury could reasonably find that their conduct was extreme and outrageous. See Appleton v. Bd. of Educ., 254 Conn. 205, 210 (2000)("Liability for intentional infliction of emotional distress requires conduct that exceeds all bounds usually tolerated by decent society") (internal quotation omitted). Crediting plaintiffs' allegations, a jury might well find that the late-night invasion of the plaintiffs' home and subsequent harassment were so abusive as to be extreme and

14

outrageous.  Defendants' motion for summary judgment as to this claim is therefore denied.

### CUTPA Claim

Mott and Phang argue that plaintiffs cannot prevail under CUTPA because their actions were not "immoral, unethical, oppressive, or unscrupulous."  See A-G Foods, Inc. v. Pepperidge Farm, Inc., 216 Conn. 200, 215 (1990) (internal quotation omitted).  Here again , a jury could reasonably find, based on the facts alleged by plaintiffs, that the actions of Mott and Phang were unethical or oppressive.

### Injuries to Paulina and Carolyn Tirreno

Finally, plaintiffs and defendants disagree as to whether Paulina Tirreno sustained damages due to defendants' actions and whether defendants' actions were the cause of Carolyn Tirreno's injuries.  These are issues of fact for a jury to decide.

### Conclusion

Accordingly, Seneca's motion for summary judgment (Docs. # 106 & 108) is hereby granted, and the motions for summary judgment filed by Mott (Doc. # 110) and Phang (Doc. # 119) are denied.  Seneca's motion to strike the affidavit of Paul Smith (Doc. # 136) is denied as moot.

So ordered this 29th day of September 2006.

```
                    _/s/_____
                    Robert N. Chatigny, U.S.D.J.
```

                                            United States District Judge